**In re ATLAS AUTOMATION, INC., a Michigan corporation, Debtor.**

**Bankruptcy No. 82–00189.**

United States Bankruptcy Court,
E.D. Michigan, S.D.,
Flint.

Feb. 24, 1983.

Allan W. Gilbert, Rice, Rice & Gilbert, Detroit, Mich., for Creditors Committee.

Jeffrey A. Chimovitz, Flint, Mich., for proponent of confirmed plan.

## OPINION

STANLEY B. BERNSTEIN, Bankruptcy Judge.

*Issue:*

The issue raised in a contested hearing on an application for fees is whether an attorney appointed in a Ch. 11 case filed under the Bankruptcy Code to represent a creditors' committee should be compensated at the prevailing hourly rate where his office is located or at the prevailing hourly rate where the case is filed. The applicable section under the Code is 11 U.S.C. § 330(a)(1).

*Facts:*

Alan Gilbert, a partner in the firm of Rice, Rice, & Gilbert, filed a fee petition in this confirmed Ch. 11 case for services performed as attorney for the Creditors Committee. Mr. Gilbert's office is located in Detroit, Michigan. This Ch. 11 case was filed in Flint, Michigan. Flint and Detroit are in different administrative units of the bankruptcy court for this district. Flint is approximately 60 miles northwest of Detroit. The 1980 census shows the population of Genesee County comprising greater Flint at 450,449, and the population of the three counties comprising greater Detroit at 4,143,633. Suffice it to say that Flint is referred to as "out-state" by the denizens of Detroit.

Mr. Gilbert applied for compensation at his "Detroit" rate of $120 an hour. He has specialized in Ch. 11 cases and more particularly in the representation of creditors committees over the past twelve years; he has been practicing law for more than twenty years, and by his estimation bankruptcy cases represents about 75% of his practice.

The proponent of the confirmed plan, Mr. Albert Austin, objected to the $120 rate request; he argued that the prevailing rates charged by business lawyers representing corporate clients in Flint in bankruptcy and non-bankruptcy cases range from $65 to $80—no testimony to support that allegation was introduced.

*Analysis:*

A. *The "Expectations" of the Creditors Committee*

Mr. Austin alleged that when the Creditors Committee voted to have Mr. Gilbert appointed, the members expected that he would be paid at the hourly rate they customarily paid their respective corporate counsel, and had they been advised at the time of his appointment that Mr. Gilbert would request compensation at his higher Detroit rate, they would have chosen other counsel.

■ Mr. Austin's allegation can not be the basis for this Court's decision. First, there was no testimony introduced at the hearing to substantiate that allegation; second, the Chairman of the Committee is an officer of a corporation based in Detroit and his company presumably pays higher Detroit rates to their corporate counsel, so the committee was not of one mind; third, frequently creditors committees select counsel on the basis of experience and not the lowest bid on rates; and fourth, it is the Court's function, not the Creditors' Committee's, to determine the reasonableness of compensation.

This Court also suspects that the objection to rates was framed in terms of the Creditors Committee's expectations as a more diplomatic statement that "out-of-town" lawyers should be paid at "in-town" rates. The issue should be met head on because of its significant policy implications. Two recently reported decisions impose "local" rates on "metropolitan" lawyers.[1] See *In re Nova Real Estate Invest-*

---

1. For purposes of analysis, a classification of "local," "regional," and "metropolitan" or "national" lawyers may be used. In this case, Mr. Gilbert may be considered as a "regional" lawyer. The category of "metropolitan" or "national" includes nationally-recognized attorneys who appear in major Ch. 11 reorganization cases like Braniff Airlines, Wickes Corporation, Energy Co-operative, Inc., or Manville Corporation, regularly lecture at the American Law Institute—American Bar Association, Practicing Law Institute, or National Bankrupt-

*ment Trust,* 25 B.R. 252, 9 B.C.D. 1310 (Bkrtcy.E.D.Va.1982); *In re International Coins & Currency, Inc.,* 23 B.R. 814, 9 B.C.D. 929 (Bkrtcy.D.Vt.1982).

### B. *The Reform Policy of the Bankruptcy Code*

■ The legislative history of the Code takes a strong stance in favor of encouraging the highest standards of professional practice in the bankruptcy courts. Congress understood that unless business lawyers were awarded rates in reorganization cases that they are paid for professional services in nonbankruptcy cases, there would be insufficient economic incentive to practice in the bankruptcy courts.[2] The justification from turning away from the frugal standards of compensation applied in cases under the Bankruptcy Act of 1898, as amended, was to improve the quality of practice in the bankruptcy courts. As the Bankruptcy Court in *In re Hamilton Hardware Co., Inc.,* 11 B.R. 326, 4 C.B.C.2d 699, 702 (Bkrtcy.E.D.Mich.1981) stated: "The legislative history accompanying section 330 makes it clear that: 'notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.'"

■ Consistent with the new position on fees must be the inference that more experienced practitioners with regional or metropolitan practices should be encouraged to accept appointments in cases filed in less populous communities. It is simply a fact that in a small community like Flint there are just not that many Ch. 11 cases filed involving substantial assets and liabilities; in this instance, Atlas Automation dwarfed almost all the other Ch. 11 cases then pending in this unit by the extent of its operations and corporate complexities. One would expect under these circumstances that an attorney who has regularly been appointed by the Bankruptcy Court in Detroit in comparably complex cases would have the relevant experience that would make him an attractive candidate to the creditors committee.

This Court observes that almost all of the Ch. 11 "regulars" with offices in greater Flint were appointed or privately retained to represent parties or creditors in this case. This Court does not take the position, however, that unless all of the competent Ch. 11 lawyers are already appointed or represent creditors or equity security holders, local rates apply to regional or metropolitan attorneys who accept appointment by the Court. The Flint-based attorneys who represented other parties in the case should, and may, have welcomed "tilting in the lists" with an experienced insolvency lawyer from Detroit.

From the Court's perspective, appointment of regional or metropolitan counsel also has a prophylactic effect on the administration of bankruptcy cases. Such counsel often enjoy the independence which is required to take an appeal from an erroneous ruling of or abuse of discretion by the bank-

---

cy Conference seminars, or who are contributing authors to the *Collier Bankruptcy Practice Guide* (M. Bender, 1981). It would be unseemly for this Court to offer its own Mikado's list of national lawyers—they know who they are.

2. The following are excerpts from the legislative history of 11 U.S.C. § 330(a):

... bankruptcy legal services are entitled to command the same competency of counsel as other cases. In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11. * * *

124 Cong.Rec. H 11,091-2 (Sept. 28, 1978); S 17,408 (Oct. 6, 1978).

* * * * * *

Bankruptcy specialists, however, if required to accept fees in all of their cases that are consistently lower than fees they could receive elsewhere, will not remain in the bankruptcy field.

* * * * * *

Bankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those who could not find other work and those who practice bankruptcy law only occasionally almost as a public service. * * *

House Report No. 95-595, 95th Cong., 2d Sess. 330 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6286.

ruptcy court; one need not emphasize perhaps that local counsel perceive themselves as constrained in taking appeals when their professional income is dependent upon favorable review of fee petitions in the mine run of cases by the one or two bankruptcy judges in town. In addition, appointment of regional or metropolitan counsel may also introduce insightful or innovative strategies in the formulation of plans or the prosecution of claims in adversary proceedings.

The dark side of limiting regional or metropolitan attorneys to local rates is to protect parochial values and the cozy comfort of a close-knit professional family of bench-and-bar. That form of professional inbreeding has, unfortunately, led to widespread public suspicion of impropriety or corruption. An effective antidote is to open appointments to all qualified applicants.

### C. Standards of Compensation

■ This Court does not suggest that in every case a regional or metropolitan attorney who is appointed should be paid his hourly rate, but his rates are most certainly a point of departure. *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624, 636 (6th Cir.1979), although a case construing the Civil Rights Attorneys Fees Awards Act, 42 U.S.C.A. § 1988 (West Supp.1979), concluded that "a fee calculated in terms of hours of service provided is the fairest and most manageable approach."

■ 11 U.S.C. § 330(a)(1) requires scrutiny of "the nature, the extent, and the value of such services." See *Northcross* and *Hamilton Hardware, supra.* If the case is routine, then the compensation would be unreasonable if allowed at rates applicable to complex cases. The ultimate justification in appointing regional or metropolitan counsel is his experience in complex cases. On the same theory, the hourly rates generally allowed in routine cases for the local attorney should also be raised in the occasional complex case filed in that less populous community.

Each application for compensation calls for the exercise of sound discretion. It would be a mindless and therefore improper exercise of discretion to limit regional or metropolitan counsel in complicated cases to local rates allowed in routine cases. It would also disclose an insensitivity, if not resistance, to a distinct shift in Congressional attitude on professional fees. This Court is also wary that invoking a standard as subjective as the "nature, extent, and value of services" can lead to sleights-of-hand which objectively reduce regional or metropolitan attorneys to local rates by "finding" the case "routine."

### D. The Award to the Applicant

■ In light of the foregoing policy considerations and after having reviewed the pleadings and general papers filed in this case, the Court has determined that an hourly rate of $110 is reasonable compensation for the applicant. That rate recognizes significant recoveries from "insiders" as a result of adversary proceedings filed by the applicant by leave of the Court.

The Court in a prior order allowed partial payment at the hourly rate of $90 after making an adjustment to eliminate services not found to be actual and necessary. The hourly rate of $90 is the local rate the Court has determined to be reasonable for an experienced attorney's services in a routine Ch. 11 case during calendar year 1982 which results in a confirmed plan. (The Court defines experienced attorneys as those with more than five (5) years of practice specializing in business reorganization cases.)

A separate order has been entered authorizing the payment of the balance of $20 an hour per the allowed 110 hours; the effective date of the order will be ten (10) days from docketing to permit filing of a notice of appeal and an application for a stay.